LEONARD G. FOGG III ET AL. *v.*
D. MORGAN WAKELEE

SUPERIOR COURT          JUDICIAL DISTRICT OF          FILE No. 05084
                       ANSONIA-MILFORD

Memorandum filed May 9, 1983

*Joseph F. McVerry,* for the named plaintiff.

*Clark, Hall & Peck-White Brothers,* for the plaintiff Rudolph Gajdosik, Jr.

*Pullman, Comley, Bradley & Reeves,* for the defendant.

JAMES P. DOHERTY, STATE TRIAL REFEREE. The plaintiffs instituted this action pursuant to the provisions of § 47-34 of the General Statutes seeking the appointment of a committee to establish the location of a lost boundary between land owned by the plaintiffs and land owned by the defendant in the town of Shelton.

The defendant filed an answer denying that the boundary was lost or was uncertain and also filed a cross complaint charging the plaintiffs with trespass on his land and with slandering his title to the land he owns by causing maps and subdivision plans to be recorded on the land records of Shelton.

The defendant sought a judgment determining that the defendant was the absolute owner of the area in dispute and that the plaintiffs had no interest in such land or any part thereof, monetary damages, including punitive damages, and injunctive relief.

The plaintiffs filed a motion to strike the defendant's counterclaim on the ground that it constituted a misjoinder of actions which was denied. The plaintiffs then filed a motion for the appointment of a committee to relocate lost boundaries which motion was also denied. Thereafter the case was referred for trial and judgment on the issues raised by the cross complaint. When the case was reached for trial, counsel for the parties orally stipulated that the issue of the appointment of a committee was no longer before the court.

At the conclusion of a long trial, counsel for the defendant stated to the court that the defendant was not seeking relief under the claim of slander of title and was confining his claim to the issue of title. During the course of the trial, the plaintiffs introduced forty exhibits which consisted almost entirely of deeds and survey maps. The defendant introduced fifty-two exhibits which for the most part were deeds and maps, with some photographs.

The plaintiffs in this action are the owners of all of the land which had been the Sarah Hard land with the exception of a few acres of it located on the easterly portion of it. They acquired title to this land by a deed of conveyance to them from David E. Ayer in May of 1978. That deed was marked Exhibit O.

The defendant, D. Morgan Wakelee, had acquired title to his land by a deed of conveyance to him from his grandfather, Gideon M. Wakelee. That deed was dated January of 1922. It was marked Exhibit C. That deed conveyed to the defendant twenty acres more or less and it too made no reference to monuments or distances. That parcel was bounded in the east by land of Glover Ewell in part and in part by Coram Lane. Glover Ewell had been a successor in title to Sarah Hard.

The parties thus had a common boundary line, being the easterly boundary, in part, of the Wakelee land and the westerly boundary of the plaintiffs' land. The earliest deed of significance introduced by the parties was a warranty deed from Horace Wheeler and William S. Wheeler to Sarah L. Hard dated January 12, 1885. It described two parcels of land. Only one of the two is material to the issues in this case, however, that being the *first* piece described therein; it describes the land as follows: "situated on the northerly side of Coram Lane, so called, and bounded easterly and southerly by

the highways and northerly and westerly by land of Gideon M. Wakelee. Containing five acres, more or less." It was marked Exhibit A.

Another deed to the same grantee, Sarah Hard, was executed and delivered to her by Gideon M. Wakelee, grantor, who was the grandfather of the defendant. That was another warranty deed dated June 1, 1888. It was marked Exhibit B. The land described in it was: "bounded northerly by lands of Royal M. Bassett in part and in part by lands of grantor. Easterly by lands of Nancy Wakelee in part and in part by highway and partly by lands of grantee. Southerly by lands of grantee and the highway and westerly by lands of the grantor. Containing twenty acres, more or less. Reserving to the grantor a right-of-way across the western part of said granted premises from land of said Bassett to the highway as the path now runs for his use and his heirs."

Most of the land described in those two deeds eventually became the property of the plaintiffs. They are adjoining parcels which are located on the northerly side of Coram Lane, a highway which is now called Rocky Rest Road. Neither the deed from the Wheelers to Sarah Hard nor the deed from Gideon M. Wakelee to her described the land conveyed by courses and distances and neither made reference to any monuments, excepting highways and the record owner of abutting land.

The land which abuts the Sarah Hard land on the west formerly belonged to the grantor Gideon M. Wakelee, the grandfather of the defendant, twenty acres of which became the defendant's land described in Exhibit C in this case.

The Wakelee family owned a large area of land lying to the west and to the north of the twenty acre parcel

which was conveyed to Sarah Hard, all of which it had acquired by a colonial grant.

Sarah Hard retained title to twenty-five acres of land described in the deeds previously mentioned until her death which occurred in 1900. Sarah Hard left a will under the terms of which title to her land passed to C. Beckwith Ewell.

In the course of time, the Ewell family conveyed title to two parcels of this property to a Charles A. Lattin. These are described in Exhibits I and J. The Ewells also deeded another parcel of land to a Charles C. Taylor and Vera Taylor which is described in Exhibit one. What was left of the Sarah Hard property was later conveyed to a David E. Ayer. This deed conveyed to Ayer land which was situated on the north side of Coram Lane and also some land on the southerly side of that highway. The land on the southerly side of Coram Lane is not involved in the dispute as to the matters in issue in this case. The deed to David E. Ayer is Exhibit two in this case. It is dated October 7, 1963, and was recorded on February 11, 1964. The land conveyed to Ayer by the Ewell deed expressly excepted from the conveyance the two parcels of land conveyed to Charles A. Lattin, Exhibits I and J, and a parcel which had been conveyed to Vera Taylor, Exhibits twenty-three and twenty-four.

Soon after he acquired title, Ayer engaged the engineering firm of Clarke & Pearson of Shelton to prepare a survey of the land which he had purchased from the Ewells. That firm of engineers completed its survey which was dated January 22, 1964. It was revised on November 9, 1964. This map was marked Exhibit F and it is this map around which the dispute between the parties as to the location of the boundary line on the westerly side of the plaintiffs' land, the easterly boundary line of the defendant, has been centered.

The map fixes the boundary line between the two properties at a point about 240 feet west of an iron pin on the north side of Rocky Rest Road along the highway. The map also indicates that in fixing the boundary line at that point the defendant would still have frontage on Rocky Rest Road of 110 feet plus or minus. The map also locates a culvert which extends under Rocky Rest Road from north to south with a forty-eight inch cement pipe, thus locating a point where a stream called Butter Nut Brook crossed under the highway.

The defendant strenuously contested the accuracy of that map. It had been certified as being substantially correct as a class A-3 grade by C.W. Pearson, a civil engineer and a senior partner in the Clarke & Pearson firm.

The defendant argues in attacking the accuracy of this map that the westerly boundary line of the plaintiffs' land was placed in the position shown on the map in an arbitrary manner so as to provide within the boundaries of the Ayer property an area which would encompass twenty-two acres of the original twenty-five acres of land which had been the Sarah Hard property. There is a notation on this map near where the westerly boundary line is shown which states: "Line to give formerly Hard 25 acre."

The westerly boundary line started on the northwest corner of the plaintiffs' land at the boundary of River View Park at a corner where it meets the land of the defendant. From there it extends on this map in a straight line, through what was called a stone wall, in a southerly direction to the north side of Rocky Rest Road.

That map, Exhibit F, also contains a *"note"* which reads: "The property lines as shown on this map represent the opinion of this office after study of deeds, inspections and investigations." The same firm of civil

engineers, Clarke & Pearson, had prepared an earlier map of the same land as that depicted in Exhibit F. This map was prepared by that firm for Alexander Schiongay in May, 1957, while the land still belonged to the Beckwith Ewells.

This map was introduced as plaintiffs' Exhibit G. It contains the same legends as does Exhibit F and in all material aspects it is identical to it. This map was certified by Mr. Clarke, the other member of the engineering firm.

Before the controversy in this case arose, the plaintiffs engaged Dennis P. McCormack to prepare a map of their land with a view to submitting it to the Shelton planning and zoning commission for a feasibility study for a contemplated subdivision development of the plaintiffs' land for residential uses.

The plaintiffs then submitted an application for a proposed subdivision of their property. When this was brought to the attention of the defendant, he notified the planning and zoning commission that he disputed the plaintiffs' title to some of the land included in the proposal.

After that had occurred, the plaintiffs engaged the services of Russell I. Boyer, another civil engineer and land surveyor, to restudy the earlier surveys upon which they had relied in their claim of title to the land which was now in dispute. He made such a survey in collaboration with Dennis McCormack and submitted it to the plaintiffs. It was dated April 27, 1979, and admitted into evidence as plaintiffs' Exhibit H-H. It does not differ in any material manner from the Clarke & Pearson maps, Exhibits F and G.

On February 17, 1979, the defendant had served on the plaintiffs notice, pursuant to §§ 47-38 and 47-39 of the General Statutes, that he intended to dispute and

was disputing any claim on the part of the plaintiffs as to any proprietary interest in land at his eastern boundary line or to any easement or right of way into the plaintiffs' land across the land to which he claimed title. That statutory notice was placed on file on the Shelton land records on February 20, 1979. It is marked Exhibit D-D.

The defendant claimed that he knew the location of the boundary line which is in dispute from having lived in the vicinity for many years, from his recollections of what his grandfather told him of the frontage on Coram Lane which he (the grandfather) then owned, many years ago, and from his personal recollection of the location of the right of way over the Hard property which had been reserved by Gideon Wakelee in the deed of conveyance of the twenty acre parcel to Sarah Hard. He also claimed familiarity with the boundary lines between all of the Wakelee land and that of their abutting owners to the north and east of the Wakelee land. He testified that his southeast boundary on Rocky Rest Road was not as it has been located on the Clarke & Pearson maps and the Boyce maps but instead his frontage included an area which measured 100 feet along the highway on each side of Butter Nut Hollow Brook. He further claimed that if the plaintiffs' maps were accepted the result would be that he would be deprived of all frontage on Rocky Rest Road, and that it would be inconceivable that Gideon Wakelee would have conveyed away to Sarah Hard or to anyone else a parcel of land which would have left his remaining land without any access to the highway, then Coram Lane.

Counsel for the defendant conducted a painstaking and thorough examination and cross-examination of every witness whom the plaintiffs adduced in an endeavor to uncover possible inaccuracies in the testimony of the plaintiffs' witnesses, beginning with Witek,

an engineer employed in the firm of Clarke & Pearson. Witek had access to all of the office records of the firm including the field books and logs which were made in the field by the surveying parties. He was one of the field men in the survey which his firm conducted for Ayer in January of 1964.

At the time of this trial, both Clarke and Pearson had died, and one other engineer who had studied this area was in parts unknown. Also, David Ayer's father had died. He would have been an important witness as to conversations with Wakelee.

The defendant also engaged a civil engineer to make a survey for him after the dispute arose. He engaged the services of Joseph L. Alberti who made a survey map which was introduced into evidence as Exhibit fifty-one. Alberti testified that he had gone into the field and had made a survey of the plaintiffs' land and also that of the property owners whose land abutted the land of the plaintiffs on the east and northeast. He testified that there were some monuments in the field, which assisted him in locating some of the boundaries of the abutting owners on the north and east. The only monuments which he could locate along the plaintiffs' westerly boundary, the line which is the basis of this dispute, were stakes or iron pins, which he believed had been placed there by the Clarke & Pearson field engineers.

In checking the deeds of the land which had been conveyed out of the original five acre parcel of Sarah Hard, the deeds to Lattin and Lattin's later conveyance of the same parcels, Alberti noted that discrepancies appeared as to the size or area of the same parcels as described in successive deeds of conveyance. One of the parcels which had been conveyed out of the Sarah Hard land after the Beckwith Ewells acquired it, being the five acre parcel acquired by Sarah Hard from the

Wheelers, was, in a later deed, described as three acres in area, in another deed, two and one-half acres in area, and in another one, four acres in area. Such monuments and courses as were set out in those deeds were inadequate accurately to describe the parcels.

Alberti made a painstaking study of all of the parcels of land owned by abutting owners on the easterly side of the plaintiffs' land in an endeavor to ascertain, as nearly as could be done, the exact area which had been conveyed to Sarah Hard. The acreage on her two deeds added up to twenty-five acres, more or less. He did this especially because of the notation on the Clarke & Pearson maps, Exhibits F and G, which read: "Line to give formerly Hard 25 acres." Thus, the true acreage was important to fix the west boundary. His survey map resulted in showing an area which measured less than twenty-five acres, and with a west boundary different from that on the Clarke & Pearson maps.

Alberti was assisted in the field by the defendant, who disputed some of Alberti's findings as to boundary lines. Alberti appears, however, to have exercised his own independent judgment in fixing boundary lines in instances where he and Wakelee differed.

Over the course of years starting at the conveyances to Sarah Hard in 1885 and 1888 through the 1960s up to the year 1979 when this dispute arose, there had been a series of important physical changes in the vicinity of the land which is in dispute. Although the parties were unable to fix the dates precisely, they both acknowledge that Coram Lane, now known as Rocky Rest Road, had been greatly widened from a narrow wagon road to a town highway of average width. The course of that road was also changed. Where there had been curves in the road, they were eliminated or they had been relocated.

The course of Butter Nut Hollow Brook may also have been changed over the years, at least that segment of it where it reaches and crosses under Rocky Rest Road as it flows from northwesterly to southeasterly.

The land now owned by both of these parties had been heavily forested with oak, chestnut and other hardwood trees. These trees were the object of major lumbering operations in years past. There is still evidence on the site of old logging roads, over the course of one of which Gideon Wakelee reserved the right-of-way mentioned in his deed to Sarah Hard. Most of this land is still covered with big hardwood trees, even though it was testified to that there have been two or more serious forest fires which have swept through the area within the past forty years.

These physical changes are mentioned to point out that there is a strong likelihood that if any fences, other than stone walls, might have existed at the boundaries of these properties, they may well have been destroyed. A twenty-four inch tree as described in a deed may have grown larger or may have been destroyed. A change in the course of the roadway would likewise make it difficult for one now viewing the premises to determine if a description in a deed meant one direction before the change which would be a different direction after it.

The court went to the area in dispute, with counsel, to obtain an on-site view of the premises. On that examination it is apparent that if the defendant's map, prepared by Alberti, Exhibit fifty-one, is accepted as the true location of the boundary line, the plaintiffs would have no usable access to their premises.

The deed from Gideon Wakelee to Sarah Hard, Exhibit B, expressly reserved a right-of-way across the land conveyed for his own land from the land of Blackman, to whom Gideon Wakelee had also conveyed a

tract of land to the north and east of the plaintiffs' land, to the highway. This right-of-way is said in that deed to be over the westerly portion of the land conveyed. It did not say at the westerly boundary thereof. That right-of-way was to be over the same course as the path then ran. There is no way to be sure of the course that path ran in 1888, but if it is the same as shown on the maps Exhibits F, G and fifty-one, it appears very likely that the way was reserved to haul logs out of the forest over that pathway to avoid the necessity of establishing a new logging road to the west, along and over the land of the grantor which would have entailed crossing Butter Nut Hollow Brook, which would probably have required the building of a bridge.

From all of the evidence which was introduced in this trial, the court concludes that the boundary line between these parties as set out in Exhibits F and G as modified by the Boyce map more closely establishes the true boundary line than does the map of Alberti. The court has read the cases cited by the defendant which make it clear that unsurveyed acreage designated in old deeds is generally the least reliable to establish property lines where the location of boundary lines is in dispute. Since, however, there were no monuments or fixed distances set forth in either of the deeds to Sarah Hard, the plaintiffs' early predecessor in title, or in the defendant's deed from Gideon Wakelee, the court must try to ascertain from all the evidence what the parties intended to convey.

Where the description of the land which is conveyed by a deed is ambiguous, the court must attempt to ascertain what it was that the parties intended to convey. *Faiola* v. *Faiola,* 156 Conn. 12, 17, 238 A.2d 405 (1968); *Spencer* v. *Mack,* 112 Conn. 17, 22, 151 A.2d 309 (1930).

The plaintiffs have made a further claim to title to the area in dispute by virtue of a claimed adverse use for longer than the statutory period of fifteen years. In this case there was no showing by the plaintiffs, through their predecessor in title, Ayer, that Ayer had made it clear to the defendant that he was claiming title to the land up to an ascertainable point. Ayer himself testified that he was never certain as to where the boundary line was.

There was no such notorious and hostile use of the land to the west of the plaintiffs' house on the part of Ayer which would have put the defendant on notice that a claim to title by adverse use was being made. See *Robinson* v. *Myers,* 156 Conn. 510, 517, 244 A.2d 385 (1968), and case cited.

There was, however, evidence that Ayer made an uninterrupted use of the driveway onto his property for a period of more than fifteen years which was open and notorious and under a claim of right. The defendant was aware of this use and although the defendant testified that he consented to the use and therefore claimed the use was not hostile, he also testified that he had at one time told Ayer that he was a trespasser, which Ayer denied, but he never took any action to interrupt or prevent Ayer's continued use of the driveway. The use of that way by the Ayers and by the plaintiff is found to have been of an adverse use which would have resulted in the acquisition of a way by prescription. *Missionary Society* v. *Coutu,* 134 Conn. 576, 584, 59 A.2d 732 (1948); *Phillips* v. *Bonadies,* 105 Conn. 722, 727–28, 136 A. 684 (1927); *Black* v. *O'Hara,* 54 Conn. 17, 19, 5 A. 598 (1886).

In view of the finding herein, however, that the title to the land within the bounds fixed by the maps, Exhib-

its E, F and H-H, is vested in the plaintiffs, the question of the right of an easement over the driveway is moot.

While all of the testimony adduced at the trial of this case was important, the testimony of the defendant and that of David Ayer, the plaintiffs' predecessor in title, was especially important. Their testimony sharply conflicted in several important aspects: Ayer testified that he had met with Wakelee on three different occasions concerning the common boundary line between their properties. He believed that the first time he met with Wakelee was on the land either just before he had acquired title to the land or just after he had done so in 1964. He testified that they walked the boundaries of the land on the east and northeast side of it. The highway bounded it on the south. They did not walk the west boundary, however, or even discuss it since there were no monuments by which that line could be determined and the terrain was too difficult to walk over. He testified that he suggested to Wakelee that their common boundary be surveyed but Wakelee did not acquiesce nor did he point out what he claimed was his line.

Ayer testified that on two of the occasions he and his father talked with Wakelee about having a survey made by an engineering firm but Wakelee declined even though Ayer agreed to absorb the entire cost of doing so. Wakelee seriously contradicted that testimony in numerous ways. He testified that on one or two occasions he had talked to the Ayers, both father and son, but on those occasions the Ayers were seeking an agreement with him for permission to use the driveway into the Ayer property.

Wakelee also testified, however, that he told Clarke, one of the engineers who had surveyed the plaintiffs' land, on one occasion when Clarke was making a sur-

vey preparatory to drawing a map of the land, that he, Wakelee, owned 200 feet of frontage on Rocky Rest Road. He also told Clarke on that occasion that he owned 100 feet on each side of Butter Nut Hollow Brook.

Apparently, Clarke disregarded that statement as to the ownership of 100 feet on each side of the brook inasmuch as he drew the map to give Wakelee only 110 feet of frontage on the highway instead of 100 feet frontage on either side of the brook.

Clarke apparently was satisfied in his own mind that no one knew precisely where the boundary line was, neither Wakelee nor Ayer nor anyone else, and he, Clarke, said so in a letter to Schiongay, for whom he had at one time prepared a survey of the plaintiffs' land.

Clarke & Pearson did the engineering work on this site long before any dispute or legal action had arisen as to the true boundary line. That firm of engineers placed the boundary line where it is located on Exhibits F and H-H, based on a study of the deeds of record, on such monuments as they could find in the field and from their investigation with interrogation of abutting owners, including Wakelee.

The burden of proof in this case is on the plaintiffs to prove that the boundary is where they claim it to be. *Lafreniere* v. *Gallinas,* 148 Conn. 660, 665, 174 A.2d 46 (1961); *Barrs* v. *Zukowski,* 148 Conn. 158, 165, 169 A.2d 23 (1961); *Simmons* v. *Addis,* 141 Conn. 738, 741, 110 A.2d 457 (1954).

On all of the evidence, the court is satisfied that the boundary lines, as determined by the maps prepared by that firm, are sufficiently reliable for the court to find the issues for the plaintiffs.

Judgment may enter fixing the boundaries on the plaintiffs' land in accordance herewith.